The next case for argument is 24-1098, Brita v. ITC. The next case for argument is 24-1099, Brita v. ITC. Good morning, Your Honors, and may it please the Court, Deanne Maynard on behalf of Brita, I'd like to reserve three minutes for rebuttal. The Commission's decision should be reversed. I'd first like to start with enablement and written description and then shift to indefiniteness. On the first two— Just on a technical—you've got to win on all three. That's correct, Your Honor, so I would like to try to talk about them all. On the first two, though, issues, the Commission's decision hinges on a plain misreading of Column 26. The Commission relied on the passage that begins at the bottom of 26, line 55. And throughout its Wands Factor analysis— What issue are you addressing? Enablement and written description. At the same time, Judge Reyna, because the Commission read this passage in Column 26, starting at line 55, as repeatedly interpreted as a failure of the inventors to apply their invention to non-carbon block filters. Over and over and over again, the Commission relies on that rationale, and it's a plain misreading of this paragraph. So all this paragraph says is the inventors tested the prior art commercially available filters, and they don't practice the invention. Well, that's nothing more than showing novelty. And they tested it using this FRAB formula? Yes, they did, Your Honor, and none of them met it. That's shown in Table 5. Those are the results. But it's not surprising that the prior filters don't practice the invention. That's why this is new and novel. But the Commission, again and again and again, in its analysis, said— I find it odd, and I'm not quite sure yet what to do with it. I find it odd that only your client's products pass the FRAB test, and nobody else does. Well, so to be clear, we tested our prior art product as well. That's the Breda product in Table 5, and it also did not pass. What the inventors came up with here was a new way to arrange known filter qualities in order, with a key constraint of 350 or preferably less than 200. Where did this formula come from? I mean, it feels like it's something out of thin air. And so I'm just curious, what's the origin story of this formula that the patent owner has created? It feels like some performance metric that it just divined and then is using as a measuring stick. Dr. Knitmeyer testified that she distilled her testing of the various filters into this formula as a way to capture balancing off the different traits. So the challenge was how to have a filter of a certain size that would filter lead quick enough to satisfy consumers with a decent lifetime. And she figured out that if you use the 350 FRAB factor as a constraint, and preferably 200, and then you modify these known characteristics of a filter, and everybody agrees, Dr. Hatch, their expert and our expert, that persons of skill and the art know how to modify the various components of the filter in order to adjust these relative characteristics. And if you aim for 350 or design your product to be 350 or 200, you will have a well-running gravity-filled filter. The problem that the ITC identified is that when you just play around with one of the variables, it's going to affect the other variables in this FRAB formula in a non-linear and unpredictable manner. And that's a fact-finding. And now we realize we're something in a shape-shifting environment, where you touch filtration time, and then that's going to affect volume, it's going to affect lead concentration, it might affect the lifetime of the filter. And so everything is on the move. And that's what made it hard for the ITC to see and understand why, based on this spec, that inventors actually invented filters beyond carbon block filters that could meet your created FRAB standard. So there's a lot packed into your question. Sort of take pieces of it. Very Justice Breyer. Sorry. So one is that, so first, the commission didn't purport to upset any of the factual findings of the ALJ in terms of credibility. The commission says, we recognize the ALJ, like, observed the witnesses in a six-day trial and made credibility findings and discredited Dr. Hatch and credited our expert, Dr. Freeman. But no matter, because the intrinsic record and the undisputed evidence gives us the answer here. And so this is not a situation where they made, they countered the ALJ's factual findings and made their own factual findings. And they did, go ahead, you want to? Yeah, well, I didn't see your briefing anywhere challenge the ITC's fact finding that this FRAB formula is unpredictable in the sense that when you play around with one variable, it's going to impact the other variables in this FRAB formula. Everyone agrees, Judge Chen, our expert, their expert, the inventor, that the factors in the FRAB formula are interrelated. Everyone agrees about that. But then to put a finer point on it, the ITC said, it's going to change the other variables in a non-linear and unpredictable manner. So that's the part that has me concerned about exactly how do you just plug in different variables or make adjustments to particular variables and then ensure yourselves that for other types of filter designs, you're going to get a FRAB under this random 350 number. Well, the testimony was, so the patent itself says in column 13 that while the discussion will focus on carbon block filters, a person with a skill in the art will understand this can be applied to any media filter. And the patent says that in multiple times. Yeah, but that's kind of canned language that doesn't help. It doesn't get us very far. So with respect, Judge Prost, I think it's not the kind of like boilerplate language that you see at the end where it's sort of like, and this will apply to all embodiments. Because it's actually, it's in column 13. It's repeated in column 25. It's repeated in column 26. The original claims 20 and original claims 21. But just because you say something multiple times doesn't get you to the result that you need to get to. But the evidence here showed they have working prototypes. They made working prototypes of carbon block. And the evidence was overwhelming before the ALJ, who credited our expert testimony, that a person still in the art could readily challenge, sorry, excuse me, readily translate the teachings in the patent and the examples to other forms of media. That it would be easy to do. That this was old science. That yes, the factors are interrelated, but one could put it together. The only thing that is on the other side, and we did challenge Judge Chin both that the commission's decision is not supported by fact or law throughout our brief. And I do think it hinges on this wrong reading of column 26. I think the whole decision falls on that. But their expert testified, Dr. Hatch, who was discredited by the ALJ, he testified, yes, it would be, the factors would be interrelated and that presents a conundrum. But you can't go from that, that there's working examples of carbon blocks, to the factors are interrelated, to that it would be undue. He had, the only thing he said, as the ALJ recognized, about it being how undue it would be, was that it would be a lot. And that, one, isn't a factual, like the commission didn't purport to upset those fact findings the way that I read the decision. It said, we rely on the undisputed facts and on the intrinsic record. And two, a lot isn't enough on that a lot. A conclusory statement like that isn't enough under this court's case law for them to meet their clear and convincing burden that in this well-established field where both experts acknowledge that persons of skill in the art know how to adjust the relative factors and make them work in the way they want and to have performance. That final phrase is really the nub of the problem here because there's an inherent tension in trying to keep the volume low and trying to keep the filtration time low and trying to keep the lead concentration low. I mean, as soon as you play with one, the other ones are going to move and move in the wrong direction. And when you look at this patent, you'll see that in the background section, it identifies different kinds of problems for different kinds of filter media. For carbon block, the problem is getting a good filtration time. For granular activated carbon, it's a completely different problem. It's like, how do you get the lead concentration down? The filtration time is fine. But then it says, if you want to try to bring down the lead concentration, guess what? The filtration time is going to get jacked up and maybe the volume too. So those are the elements of problems where then the question is, are there any solutions to those problems expressed in the specification? Like there's a solution provided for carbon block and the patent is devoid of any proposed solutions for the particularized problems that you get with the granular activated carbon media. So two points. One, I think the background of the invention shows that persons of skill and the art know exactly how to modify these things in order to get the desired characteristics they want, which Hatch agrees at A23467 to 68. Two, Dr. Freeman testified and explained, and the ALJ credited, that from the carbon block examples, a skilled artisan would know the volume of the filter, would know the components that had gone into it, the lead scavenger, the activated carbon, how closely compressed the activated carbon and lead scavenger had been. And that would give them an idea of the pore size. And a person of skill in the art could use those same starting materials and apply them to a different geometry to get comparable performance because the components and the raw materials that go into the filter are going to perform their function in any filter media that they're put into. The ALJ credited that testimony at A290 and that testimony is A23521 and 522. And there's multiple similar places like that. And the reason the commission went a different way is because it repeatedly cited this paragraph on the bottom of 26 as a failure of the inventors to apply their invention to non-carbon block filters. And it's just simply not that. It sounds to me that what you're claiming is the formula. And that's something I couldn't shake loose when I was reading through the briefs here that what you're actually claiming is a formula. You're not claiming certain filters. We're claiming... So just to explain how I understand it to Adrena. What we're claiming is a filter with activated carbon and a lead scavenger that's arranged using this formula. So in other words, this distills the choices that you want to make, the design choices that you want to make. The field of art is really crowded here. Right? I mean, it's no secret that you can pour water through different elements, and gravity will pull it through, and you have filtered water. What's different about your invention is that it meets a certain specification that's expressed by the application of a mathematical formula. So I agree with the first part of what you said, which actually proves my point, which is this is a way to arrange well-known, well-studied attributes. And it's critical that the formula laid out, the frat factor, it gives a critical constraint, which is that you want to arrange the elements, which everybody agrees persons of skill in the art know how to do with all sorts of media filters, in order to meet the critical constraint of 350 in the frat factor. That's the guidance it's telling you. That's the discovery they made. And the testimony overwhelmingly shows, and ALJ credited, that persons of skill in the art could modify the carbon block examples, and there are lots of them in patent, and use the information from that and apply it to other filter media. Because, as you say, Judge Reina, it's really well-studied, old, well-known art. On your point about the evidence, though, I mean, it doesn't conclusively result in a win for you just because you've got some evidence on your side. I mean, on a substantial evidence review, that doesn't carry the day for us. So we agree. I mean, you have some expert testimony that says what you want it to say, but that's not sufficient to reach the result you want us to reach, right? Well, I think it is here, Your Honor. So in this case, the only rationale the commission gave for its decision was that the intrinsic record alone and the undisputed testimony was enough to hold that they had met their clear and convincing burden. It acknowledged that the ALJ had made credibility findings and other findings of fact that said, never you mind. I don't have to worry about that, because there's an admission in the patent at the bottom of column 26 that they tried and failed. OK. You can take your point on that.  But at the right kind of time. I'm sorry. I want to make sure you're way into your rebuttal. But I want to make sure you have time to reach the other issues here. Because, as you noted at the outset, you've got to prevail on all three. So I'll give you another three minutes to deal with the other issues in this case. Thank you, Your Honor. I greatly appreciate it. I can deal with indefiniteness pretty promptly. Which is, in this industry, the common understanding of claimed lifetime is a validated or verified lifetime. The commission went wrong by looking at American heritage and regular dictionaries instead of what a person of skill in the art would understand as the patent explains. Typically, in this health-related industry, manufacturers and sellers aren't going to just make up claims about when you should replace your filter. They're going to validate it and verify it in some way. So that's an ordinary meaning. And nobody, not the commission, not the other side, suggests that if it does mean validated, it's indefinite. Is there some extrinsic evidence to support that? To support that that's what it means? Right. Well, I think you can get that from the patent itself. But the patent incorporates, by reference, the NSF ANSI standard 53, which requires that you can't claim it unless it's validated. And so it's incorporated by reference in a couple places in the patent. And then that standard itself is in the record. And it requires validation and verification. But even if you don't think that the ALJ's claim construction is correct, even if it means claimed in the American heritage sense, that's not indefinite. That's an objective fact. Whatever the manufacturer or seller claims the lifetime of their filter is, is not aesthetically pleasing. It's either 40 or 60 or 80 or 100. You look on the box. You see what it is. There's no indefiniteness to that. So either way, that piece of the judgment should not stand. And I'll save whatever time you might be willing to give me back, Judge Rose. Thank you. We'll always join you. Thank you so much.  Mr. Hughes?  Good morning, and may it please the Court. The commission didn't only rely on column 26 and line 55 in making its recent description findings. What the commission relied on was inventor testimony. The inventor- We relied on both, right? Right. We didn't rely on column 26. We did. We did mention that. We relied on the disclosure, as well as inventor testimony, as well as expert testimony. So the evidence the commission relied on is more than sufficient for the Court to affirm the commission's written description finding. This is what the inventors testified to. The inventors were asked how they came up with this frappe formula, which is all the patent really claims, right? The patent claims a mathematical equation which purportedly helps with filtration of water. The inventors were asked how they came up with this frappe. This was the response. The response was that they switched from using granular mixed media to using carbon blocks. That was the only way they were able to come up with this invention, which means that at a minimum, they did not possess mixed media. That alone dooms the appeal. Now they went further because they were also asked how could you come up with this frappe factor using any other filter media? Well, the response was you would have to come up with new technology. That was the response from the inventors. And they also testified that they did not invent this new technology. So what we have here was- What did the ALJ do with that testimony? Did she discredit it? Did she credit it? No, she didn't discredit that. She did not. The error the ALJ made, which the commission found, was ALJ considered this invention at a very high level of generality. The ALJ simply considered as activated carbon-led scavenger, as opposed to what this court case law requires, the claimed invention, which is simply a functional claim directed to a performance result, which is unknown in the industry. That is what is- But it's effectively what the invention is. And what the inventors describe and arrange in their patent, the only disclosure in the patent as achieving this frappe is carbon blocks. That's it. Now the commission also credited expert testimony. Dr. Hatch testified that one of ordinary skill reading this patent disclosure would only understand that the inventors only possessed carbon block filters. Right. Their own experts- It's not just any carbon block filter. Right. Even there. Correct. It's a multi-core, multi-block core with a particular structure. Yes. Particular size particles, particular porosity based on the particular type and amount of binder, et cetera, et cetera. Right. That's correct. That's very correct, Your Honor. That's exactly what they did. It took me 20 columns to tell us that. I know. But then in their patent, they actually, it provides elaborate and detailed description and disclosure on how to arrive at the carbon block, on how to achieve this frappe with carbon blocks. It does absolutely nothing else with any other filter. What about what the, and you know the provisions that Ms. Maynard is referring to.  What she's referring to, right. Oh, let me finish. Oh, I'm sorry. Numerous provisions in the spec which say otherwise. There's really no numerous provisions in the spec. The spec mentions different filter media were known in the art. It mentions that. What she's referring to, I believe, is where they say they tested mixed media and none of the mixed media they tested actually satisfied this frappe. And I believe the argument is that what they tested was a prior art. But if we go back to what the inventors actually, what the inventors testified to, they switched from this very same mixed media. The inventors were able to switch from that to carbon blocks. And that is the only way they were able to achieve this frappe. So whereas that disclosure goes to the prior art, it also discloses exactly what the inventors were not able to achieve. To follow up on Jeff Post's question, which is what the opposing counsel was talking about, it could be that the ITC put too much emphasis on column 26. Sure, the prior art mixed media filters did not achieve this particular performance metric. But it would be an improper shortcut to say, and therefore, a skilled artist would not know how to make and use a mixed media filter that would accomplish this performance metric. Do you see the problem? I see. I see the argument. But the commission didn't rely. The commission didn't mention that disclosure. But the commission didn't rely exclusively on that. The commission mentions various also sections of the patent where the commission makes clear that carbon chemistry and the shape and the size were all instrumental in achieving this frappe. So the commission's decision doesn't rest on this one specific disclosure in the background. Moreover, the commission also relied on the inventor testimony as well as expert testimony. And the commission's written description finances review for substantial evidence. And in this case, the evidence the commission relied on was very strong. And if I may quickly also mention enablement. Dr. Hatch testified that all of these variables are interrelated, such that, and their own expert also agreed with that, such that you can't change one variable and expect any linear or corresponding results for the frappe. What happens is when you change one variable, you don't know what happens to the equation. But despite that, the patent gives you no teaching guidance on how to achieve this frappe with any other filter media outside of carbon blocks. The commission actually went through each of the one factors in its enablement, and each of the one factors to show that it would take undue experimentation if one afforded a risk in the arts to practice this invention outside of carbon blocks. If I may briefly, quickly touch on indefiniteness, the problem for Britain for the patent with respect to indefiniteness is that the claim limitation, which is the lifetime, all it says is lifetime that is claimed by a manufacturer or seller of the filter. It is not tied to any inherent quality of the filter. It's an open-ended claim limitation. And one of ordinary people reading this limitation wouldn't know it meets and bounds. What the patent suggests is for you to go to advertising material, and the commission is unaware of any case law from this court which suggests that product manufacturing, product data or advertising material is somehow sufficient to delineate the scope of a claim limitation with any reasonable certainty. Thank you. Morning, Your Honor, and may it please the Court, Adam Swain from Alston Bird on behalf of the intervener respondents. I'd like to start briefly where my colleague left off with indefiniteness. Now, my friend from Brita here mentioned that this isn't an aesthetically pleasing, datamized situation. That may be true. What it certainly is, though, is a DAO situation where you have infinite ways of coming at what this lifetime is. It can be something you validate or not. It can be something you put on your packaging or not. It can be something you claim covertly or overtly or not. And we know this from the patent itself. If you look at Table 5, every embodiment is given a lifetime of 40. It doesn't mean it was claimed, verified, validated, put on packaging, advertising. It doesn't say how they came up with it. What about Ms. Maynard? And I recall this being the case that she mentioned. I don't know if it's in the spec or there was evidence about this. I don't know. Is it the NSF standard or that there's a standard that's used in the yard? There's a standard called NSF-53, which gives you some guidance as to how to test for lead. Now, that has evolved over time. But in no way did the construction of the ALJ or the patent itself limit that lifetime to validation under NSF-53. It could be validated under chlorine, chromium, all sorts of other contaminants. Aren't there rules of the game in terms of manufacturers putting lifetime stuff on their packaging? Depends. Yes, there should be. It's not anything and everything in the world. I assume there's guidance and there are requirements in terms of representations. Quite correct, Your Honor. In the real world, there are. But not in the world of the 141 patent. They arbitrarily put the lifetime as 40 on their prototypes, which they haven't validated for any lifetime, haven't put on any manufacturing label at all. So yes, in the real world, yes, there are ways you can challenge someone's lifetime. Brita, Pure, Lysol. No one's going to put a lifetime that they haven't verified on their product. The problem is when it comes to prior art, when it comes to embodiments of the patent, and it comes to ascribing a lifetime to a filter, anything goes in the 141 patent. They just arbitrarily choose 40. And I think it's best shown that in their blue brief on page 51— If they choose 40, then that's what they've claimed. How— I guess the problem is you want to look behind whether it's accurate or not. And maybe that's not even what the claim calls for. If the claim just simply calls for the lifetime is whatever, go reference another document, and you'll get that number. And then if that number is different from a second document that claims yet a different lifetime value, then you'll have an indefiniteness problem. Because then you'll have multiple documents or multiple standards indicating different values. Then there's an indefiniteness problem. But just the mere fact that they claimed a number, whether it is truly scientifically accurate or not, is nevertheless the number that they claimed. And if it happens to be in a document, whether it's on their website or the materials that come with the product, that's the number. So it's not unclear or unbounded or uncertain as to what the meaning is. So the problem is you're correct. They can claim it, and that's something you can objectively see, but it's the way you get at it. How did they verify it? Just like in doubt. How did they come to this lifetime? Is it what they wrote down on the packaging? Did they use NSF-53? Why does it matter if what we're talking about here is a claim as to what the lifetime of the product is? And if the claim is 30 days, which is 100 days or 150, you satisfy that, right? Sure. But that certainly matters as to what the scope of the patent is. If the lifetime is 20, that impacts where you measure your effluent lead, which impacts the FRAP factor, right? So if you say your lifetime is arbitrarily 20, that changes your FRAP value, not just in a linear sense by doubling it, but it also impacts when you measure your outgoing lead, the CE, in the numerator of the FRAP equation. It changes that because that's when you measure it. Are you going to talk about written description? I'd love to talk about written description, Your Honor. Now, one thing before I do, though. My friend at Brita did mention that in their reply brief that this was not a functional patent. This is only a functional patent. FRAP stands for the Filter Rate and Performance Factor. The patent tells us in this column that we've been talking about, column 26 lines 61 through 65, that no mixed media filters tested met the claimed FRAP factor range due to their inability to remove particulate lead. The formulations of the gravity-fed carbon blocks disclosed are unique in their ability to meet the required FRAP factor. The reason the patent says this is because it's the truth. The inventors came up with specific carbon blocks that involved binders and minced up carbon, very different than mixed media filters, to crack the FRAP equation to get that really low reduction of lead that gives them the difference in the FRAP. The reason it tells the truth is because every inventor confirmed this in their depositions. Every inventor testified, no, we did not come up with mixed media. The secret to this was moving from mixed media to the carbon block. It gave us more surface area. They even tried to patent their carbon blocks in the parent applications and giving the various cylinder sizes, the compression rates, all of the different types of carbons you would put in it. And it was turned down by the patent office for lacking written description and enablement. And so they turned and they figured out, what can we patent here that's the difference between what's out there in the art and what we have? And that's where FRAP came from. Didn't the ALJ credit Dr. Freeman over Dr. Hatch in terms of whether a skilled artisan would be able to use activated carbon and the lead scavenger and these other types of media to get the good FRAP value? So there's a key distinction in there, your honor. The distinction is that they credit the ability that it's known in the art to change these variables to use activated carbon and lead scavenger in a filter. There's no question that skilled artisans could do that. There's no question that people could change volume and change the inputs, at least volume as an input and change your carbon as an input and change your filter shape as an input and then test it to see how it does with the FRAP. But that's not the question. The question is, can a skilled artisan, including BRITA, including people skilled at art at the time, take a known filter and get to that exceptional FRAP filter rate that was the point of novelty of this patent? The patent tells us they couldn't. None of the mixed media filters that BRITA had in its possession that they tested or tested on the market, pulled off the shelf or tested themselves could meet that FRAP limitation. So they switched to carbon block, tried to patent those, didn't get those, and then came up with the FRAP equation and tried to patent that, covering all filters, not just mixed media, not just depth media. Any filter out there that has carbon block and something that reduces lead that meets the FRAP equation, regardless of who invented it. And I think it's telling, Your Honor, that in the actual specification, they tell the world that mixed media filters cannot meet the FRAP limitation because they cannot reduce particulate lead. And every accused product in this investigation is a mixed media filter. And I think that is a poster child for violations of criminal law. How did your clients figure it out? It's many, many, many years, Your Honor. And trying new and old ingredients, it took, speaking here just knowing myself, I would say 10,000 hours almost to get there. So I know that this issue is not before us, but I'm still interested in the Section 101 decision. Was a determination ever reached by the ITC on that? No, Your Honor. The Commission took no position on it. So if you were to reverse on all three, it's going to be remanded to the Commission to not only look at 101, look at 102 for anticipation, look at 112 again, because not only do we have a chance... Did the AOJ reach those issues? She did reach those issues. She got a patent eligible, right? She did. But in doing so, she also found that there's a problem with all of the factors involved that they are interrelated and that they have unpredictable results. But all of that has been vacated and taken no position on by the Commission. And so if it gets remanded, if we get through all three of these hurdles today, it's going to go back to the Commission. When does this patent expire? December 20th, 2026. And I'm hoping my friend will correct me if I'm wrong on that. What was the focus of the 101 argument or discussion? Was it the FREP formula or the carbon black filters? Well, it's the idea that they've come up with this equation that by its application preempts an entire field of water filtration. The only structure that's given in the equation is activated carbon, which every filter has had since the Romans, and a lead scavenger, which has a very broad definition, which is anything that reduces lead from drinking water. Very broad definitions. And all that's limited by is the performance of that filter. Can it be fast? Can it be reducing lead enough to get under that trap of 350? So the idea is they are preempting an entire field of gravity-fed water filtration in the future, regardless of the format, the size, and the type of media that it actually uses. So that's the gist of the 101. Thank you. Thank you very much. Thank you for your indulgence, Your Honor. I'll be quick. So to the commission's arguments, the commission's decision cites, it says it is relying on only expressed disclosures in the patent and the undisputed record. That's at A38 and A35 to 37. There's something similar about enablement on A57 to 58, the undisputed record. So they did cite, in a couple of places, Dr. Hatch and Dr. Freeman, but for undisputed points. Undisputed points that there are only carbon block working examples in the patent, and that the FRAP factors are interrelated. But they didn't undo the fines of fact by the ALJ, who credited our expert and discredited Dr. Hatch on the things that matter. Could a person of skill in the art take the teachings of the patent and apply them to other filter media? And despite what my friend on the other side says, the ALJ repeatedly found that and credited Dr. Freeman saying it would be relatively easy to do. It's old science. It would take a short while. It's routine. Persons of skill in the art can do it. I mean, wasn't it true, though, that in the prime art for mixed media filters, there was already a known desire and goal to have good filtration time and low lead concentration? But then when it turned out for mixed media, it couldn't have both. You'd either have a good filtration time and high lead, or you'd have an acceptable amount of lead, but then a high filtration time. And now the invention is go do both. Figure it out. That's kind of the nub of the problem here, where it's meet this formula by having a low filtration time and a low lead concentration. I figured it out for carbon blocks. Now, you do it for mixed media, non-wovens, hollow fibers, ligands, and whatever else are known. And that's what the trial was about, Judge Shen. And the ALJ credited our expert and discredited their expert and found as fact that this was well-known science, that he teaches these principles for 30 years to undergraduates, that it's simple to do, that people of skill in the art know how to do it. And that's not the basis of the Commission's decision here. The Commission relied on a misreading of Column 26, undisputed evidence that I mentioned, and inventor testimony to bolster its conclusion about, its wrong conclusion about Column 26. And my friend on the other side cites the unique sentence in Column 26 that says, the formulations disclosed here are unique. And yes, the formulations disclosed, the working examples are carbon blocks. Nobody disputes that. But it wasn't saying we tried to apply this or it won't work to mixed media. And just one thing on indefiniteness. Well, one more point. The narrative is just not true, that they cite that we applied for the other patents and then sought this one. This one was sought and filed before any of the dates that they attach in theirs. And with that, we would ask you to reverse. Thank you so much for your indulgence. Thank you. And thank all sides. And the case is submitted.